**UNITED STATES of America, Plaintiff,**

v.

**Victor J. ROMAN–MARCON, Defendant.**

**Cr. No. 93–211 (JAF).**

United States District Court,
D. Puerto Rico.

Sept. 9, 1993.

Asst. U.S. Atty. Hernán Ríos, Jr., Charles A. Fitzwilliam, U.S. Atty., San Juan, PR, for plaintiff.

Gregorio Lima, Bayamón, PR, for defendant.

### OPINION AND ORDER

FUSTÉ, District Judge.

On July 6, 1993, defendant, Víctor J. Román–Marcón, appeared at a skyjacking security checkpoint that gives access to certain departure gates at the Luis Muñoz Marín International Airport, Carolina, Puerto Rico. Defendant Román–Marcón had an airline ticket to board a specific scheduled flight that day. The security checkpoint was manned by Esther García–Jurado, a Wackenhut Security Services Supervisor, and by Pedro Ortiz–Martínez, a Commonwealth of Puerto Rico Police Officer. Román–Marcón passed through the magnetometer and, as he passed, the machine gave an alarm that metal had been detected. Normally, when a magnetometer alarm is triggered, the security employees ask the passenger to empty his pockets and to place any metal objects on a

table. He is then directed to pass through the magnetometer once again. In our particular case, Ms. García–Jurado called the passenger to complete the security check process, but he continued walking towards the gate area quite fast. She noticed that he was walking in a strange way. Once again, Ms. García–Jurado asked the passenger to stop and wait so that she could check him with a hand-held magnetometer or scanner. Upon checking Mr. Román–Marcón with the hand scanner, the same gave an alarm. Ms. García–Jurado touched the defendant's clothing at the place where the instrument was set off and she felt what appeared to be packages. The place where the second check was conducted was at some distance from the stationary magnetometer and tables. At this point in time, police officer Ortíz–Martínez was in the process of completing an investigatory search on two other passengers who had been found carrying contraband. Ms. García–Jurado called the police officer and the officer interviewed the passenger and patted him down. He felt packages and became suspicious. Mr. Román–Marcón was detained and turned over to Drug Enforcement Administration ("DEA") agents. Security personnel are always on the lookout for weapons, explosives, and contraband.

The court has before it a motion to suppress the evidence seized after the detention of the defendant.

### The Applicable Law

■ "Section 202 of the Air Transportation Security Act of 1974, 49 U.S.C. § 1356(a), requires a pre-boarding search of all passengers and their carry-on baggage for weapons and explosives, pursuant to regulations established by the Administrator of the Federal Aviation Administration." *United States v. Sullivan*, 544 F.Supp. 701, 707 n. 5 (D.Me.1982), *aff'd.*, 711 F.2d 3 (1st Cir. 1983). However, the search for weapons and explosives must conform to constitutional requirements. The passing of an individual through a magnetometer is considered a search within the meaning of the Fourth

Amendment. *Id.* at 709; *United States v. Albarado*, 495 F.2d 799 (2nd Cir.1974); *United States v. Slocum*, 464 F.2d 1180 (3rd Cir.1972); *United States v. Epperson*, 454 F.2d 769 (4th Cir.1972). However, since the invasion of the privacy constituted by a measuring of the distortion of magnetic waves around their body is so minimal, courts have found that an administrative search with a magnetometer does not constitute a constitutional violation. *Wilkinson v. Forst*, 832 F.2d 1330 (2nd Cir.1987), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 907 (1988).

■ The difficulty arises after the magnetometer has alerted the attending security personnel to the presence of metal. Here, the constitutionality of the search is subject to the test in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court found that a warrantless search was allowable where "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. at 1883. Then, the search must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879.

■ The policy behind the limited administrative search of all passengers is to prevent hijacking or airplane terrorism. Therefore, once the magnetometer has alerted the attending personnel to the presence of metal, the passenger must submit to further search if he intends to continue his plan to board the aircraft. The leading case in this area, *Albarado*, has outlined the procedure to be followed once the magnetometer has been triggered the first time. The individual should be passed through the magnetometer a second time after having removed all metal items or should be scanned by a hand-held magnetometer. Where there is again evidence of metal, the security personnel may frisk the individual. *Albarado*, 495 F.2d at 809; *United States v. Smith*, 643 F.2d 942, 944 (2nd Cir.1981); *see also*, *Epperson*, 454 F.2d at 722.[1] At this point, the security

---

1. "When the high metal indication of the magnetometer was not satisfactorily explained by Epperson, the subsequent physical 'frisk' of his packet was entirely justifiable and reasonable under *Terry*." *Epperson*, 454 F.2d at 772.

officer might feel something under the individual's clothing. Here, as *Terry* dictates, the reaction must be commensurate with the urgency of the situation. If the object felt while the individual is being frisked has the size and consistency of "a container for a pistol or even explosive material," *United States v. Lopez*, 328 F.Supp. 1077 (E.D.N.Y. 1971), it should be removed for the officer's inspection. "If an officer comes lawfully upon a container which may conceal such items, he may require that they be opened to his inspection before the passenger is allowed to proceed on board with the container." *Albarado*, 495 F.2d at 809.

■ Of course, the second magnetometer walk-through is not the only alternative available to the authorities. Where airports are equipped with hand-held magnetometers, they may be used to locate the metal on the passenger's body and he then may be required to remove it so that they may be assured that it is not a forbidden article. *Albarado* specifically holds that the procedure there suggested is not to be considered exhaustive, the important rule being that the frisk in the typical boarding situation is to be used only in the last instance.

■ In this case, the magnetometer went off as the defendant passed through it. He then had a second opportunity to pass through after removing any metal content from his body. However, the defendant initially failed to follow the instructions of Ms. García–Jurado, the Wackenhut Security Services Supervisor. At this point in time, Supervisor García–Jurado, rather than making the passenger walk through the fixed magnetometer again, decided to walk to the place where the passenger finally stopped and use the hand-held scanner, which serves the same purpose as the stationary unit. After the hand-held magnetometer had rung a second time, the airport security personnel were at liberty to subject him to a more physical search, unless he indicated that he no longer wished to board the flight. To begin with, the security officer's use of the hand-held magnetometer was a less-intrusive alternative than a pat-down or frisk. At that point in time, she reacted and simply touched the defendant's clothing and felt a substantial bulge under it. During the suppression hearing, defendant stressed that the only item that the security officers could be looking for would be weapons and that Román–Marcón's detention was prompted by the earlier detention of other drug couriers. However, hijackers, as well as airport officers, know of the existence of plastic explosives or even ordinary dynamite or contraband. These items do not necessarily react to a magnetometer alarm in the same way and, even if they do by the coincidence of metal with the substance, it is perfectly legitimate and within the limits of the authority of the security officer to request to see the item or, under the particular circumstances of this case, touch the clothing to get an idea of whether the officer has encountered a bulky belt or a package.

Enlisting the aid of a policeman does not implicate the defendant's fourth-amendment rights in a negative way. Once the package had been revealed to the policeman in the course of this reasonable airport search, the policeman had probable cause to believe that the package contained contraband. He then arrested the defendant and transferred custody to a DEA agent.

### Conclusion

This court does not feel that defendant's fourth-amendment rights were infringed by a search that reasonably responded to the presence of contraband in the form of an unknown bulge, possibly metal, under the defendant's clothing, as he was attempting to board an airplane. The motion to suppress the drug evidence is **DENIED.**

**IT IS SO ORDERED.**